AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Northern District of California

| | |
|---|---|
| United States of America<br>v.<br>Kevin ESTRADA MEJIA<br><br>*Defendant(s)* | Case No.  3:23-mj-70834 MAG |

**FILED**
Jun 08 2023
Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of  February 16, 2023  in the county of  San Francisco  in the
Northern District of  California , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) and 841(b)(1)(C)<br><br>18 U.S.C. § 2 | Distribution of fentanyl (aiding and abetting)<br><br>Maximum penalties:<br>• Imprisonment: 20 years (21 U.S.C. § 841(b)(1)(C))<br>• Fine: $1 million (21 U.S.C. § 841(b)(1)(C))<br>• Supervised Release: Min. 3 years – Max. life (21 U.S.C. § 841(b)(1)(C))<br>• Special Assessment: $100 (18 U.S.C. § 3013(a)(2)(A))<br>• Forfeiture: 21 U.S.C. § 853(a) \| Deportation \| Denial of Federal Benefits |

This criminal complaint is based on these facts:

Please see the attached affidavit of DEA SA Connor R. Hooper

☑ Continued on the attached sheet.

Approved as to form  */s/ Nicholas M. Parker*
AUSA Nicholas M. Parker

/s/ Connor R. Hooper
*Complainant's signature*

DEA SA Connor R. Hooper
*Printed name and title*

Sworn to before me by telephone.

Date:  06/08/2023

*Judge's signature*

City and state:  San Francisco, California

Hon. Sallie Kim, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Connor R. Hooper, a Special Agent of the Drug Enforcement Administration, being duly sworn, hereby declare as follows:

### INTRODUCTION AND PURPOSE OF AFFIDAVIT

1. I make this Affidavit in support of an application under Rule 4 of the Federal Rules of Criminal Procedure for a criminal complaint and arrest warrant charging **Kevin Estrada MEJIA** with one count of distribution of a mixture or substance containing a detectable amount of N-phenyl-N- [1- ( 2-phenylethyl ) -4-piperidinyl] propanamide, also known as fentanyl, and aiding and abetting another individual in the same, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C), and 18 U.S.C. § 2, on or about February 16, 2023, in the Northern District of California.

### SOURCES OF INFORMATION

2. Because this Affidavit is submitted for the limited purpose of securing a criminal complaint and arrest warrant, I have not included every fact known to me concerning this investigation. Instead, I have set forth only the facts necessary to establish probable cause that the violations of federal law identified above have occurred.

3. I have based my statements in this Affidavit on my training and experience, personal knowledge of the facts and circumstances obtained through my participation in this investigation, information provided by other agents and law enforcement officers, and information provided by records and databases. I believe these sources to be reliable. Where I refer to conversations and events, I refer to them in substance and in relevant part rather than in their entirety or verbatim, unless otherwise noted. This Affidavit also reflects my current understanding of facts relating to this investigation, but my understanding may change in the future as the investigation proceeds.

### AFFIANT BACKGROUND

4. I am a Special Agent with the DEA assigned to the DEA San Francisco Divisional Oakland Resident Office in Oakland, California, and have been so employed since July 2019.

5.      As a Special Agent of the DEA, I am an investigator and law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7). I am empowered by law to conduct investigations, to execute search warrants, and to make arrests for offenses of federal law, including drug offenses. I investigate narcotics and related offenses.

6.      My training included a seventeen-week DEA Basic Agent Training Academy at the DEA Academy in Quantico, Virginia. This training included instruction in the investigation of federal drug violations, including, but not limited to, 21 U.S.C. §§ 841 and 846. Additionally, this training included several hundred hours of comprehensive, formalized instruction in, but not limited to, narcotics investigations, drug identification, detection, interdiction, financial investigations and money laundering, informant handling, law classes, report writing, identification and seizure of drug related assets, undercover operations, and electronic and physical surveillance procedures.

7.      During the course of my employment as a DEA Special Agent, I have participated in over 30 narcotics investigations either as a case agent or in a supporting role. I have debriefed defendants, confidential sources, and witnesses who had personal knowledge regarding narcotics trafficking organizations. I also have participated in many aspects of drug investigations including, but not limited to, undercover operations, telephone toll analysis, records research, and physical and electronic surveillance. I have assisted in court-ordered wiretap investigations, and I have participated in the execution of numerous federal and state narcotics search and arrest warrants that resulted in the arrest of suspects and seizure of narcotics.

8.      Through my training, education, experience, and my conversations with other experienced agents and officers who conduct drug investigations, I have become familiar with narcotics traffickers' use of mobile telephones and mobile telephone applications, Internet applications, social media applications, as well as narcotics traffickers' use of code words to conduct business. I have become familiar with narcotics traffickers' methods of operation, including, but not limited to, the manufacturing, distribution, storage, and transportation of

narcotics, and the methods used by drug traffickers to collect, transport, safeguard, remit, and/or launder drug proceeds.

9. During the course of my law enforcement career, I have been involved in investigations of numerous federal and state criminal offenses. I have participated in numerous investigations of illicit drug trafficking organizations, ranging from street level dealers to major drug trafficking organizations ("DTO"). These investigations have included the use of confidential sources ("CS"), undercover agents ("UC"), and sources of information ("SOI") (collectively "Sources"). These investigations have also included the unlawful importation of, possession with intent to distribute, and distribution of controlled substances, the related laundering of monetary instruments, the conducting of monetary transactions involving the proceeds of specified unlawful activities, and conspiracies associated with criminal narcotics offenses, etc. These investigations have resulted in numerous state and/or federal prosecutions of individuals who have possessed, imported, or distributed controlled substances, as well as the seizure of those illegal drugs and the proceeds from the sale of those illegal drugs.

10. I have been involved in the execution of numerous federal and/or state narcotics-related search warrants. As a result, I have encountered and become familiar with the various tools, methods, trends, paraphernalia, and related articles used by drug traffickers and trafficking organizations in their efforts to import, conceal, manufacture, and distribute controlled substances. I am familiar with the appearance of heroin, cocaine, methamphetamine, marijuana, MDMA, and other controlled substances. I am familiar with and aware of the terminology used by narcotics traffickers concerning narcotics and narcotics dealing.

11. I have interviewed numerous drug dealers, users, and confidential informants, and have discussed with them the lifestyle, appearances, and habits of drug dealers and users, the use and meaning of coded language and the concealment of assets. I have become familiar with the manner in which narcotics traffickers smuggle, transport, store, and distribute narcotics, as well as how they collect and launder drug proceeds. I am also familiar with the manner in which narcotics traffickers use telephones, cellular telephone technology, pagers, coded or slang-filled

telephone conversations, false or fictitious identities, and other means to facilitate their illegal activities and thwart law enforcement investigations.

12. During my time at DEA, I have initiated and participated in Organized Crime Drug Enforcement Task Force (OCDETF) investigations. The OCDETF program is part of the United States Attorney General's drug strategy to reduce the availability of drugs by disrupting major trafficking organizations through joint-agency collaboration.

13. I have participated in approximately five investigations in which court-authorized Title III interceptions were used in narcotics and/or money laundering investigations. During these investigations, I have listened to and deciphered conversations between narcotics traffickers in which they discussed their criminal activities in coded language or intentionally vague language, and which were later corroborated by surveillance or defendants' statements. I have also interviewed several drug traffickers after their arrest, as well as confidential sources, and discussed with them the meaning of the coded language they used during the course of the commission of drug and money laundering offenses. During these interviews, the arrested drug traffickers and confidential sources have explained to me how they use coded language to conceal the true nature of their conversations from law enforcement and anyone who may be listening or overhear the conversation. As a result, a person who did not know the code or their meaning would think the individuals were having an innocent conversation or would be confused by the conversation since it would not make sense to that person.

14. Before joining DEA, I was Police Officer for the City of Chicago. As part of my official duties as a Chicago Police Officer, I responded to 911-dispatched calls involving homicides, gang and domestic violence, drug trafficking, emergencies, traffic accidents, and other criminal activity. I arrested numerous individuals, to include drug traffickers, on misdemeanors and felony charges. In addition, I collected preliminary investigation information as a first responder to crime scenes. I conducted over 100 traffic stops, while also issuing citations and mandatory court appearances. I organized and wrote reports related to arrests, investigatory stops, and other observed incidents. In this role, I also participated in the execution

of multiple state issued search warrants, and testified in the State of Illinois Circuit Court of Cook County. I collected and processed evidence to include firearms and narcotics. I interviewed violent offenders and drug traffickers, as well as obtained testimony from witnesses and/or victims.

15. I have personally participated in the investigation discussed in this affidavit. I am familiar with the facts and circumstances of the investigation through my personal participation. I have also learned other things about this investigation from fellow law enforcement officers and agents. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by a DEA agent or task force officer, law enforcement officer, or witness who may have had either direct or hearsay knowledge of that statement and to whom I or others have spoken, or whose reports I have read and reviewed. Such statements are among many statements made by others and are stated in substance and in part unless otherwise indicated. Because this affidavit is being submitted for the limited purpose of showing that there is sufficient probable cause for the requested warrant, I have not set forth everything I know about this investigation.

## APPLICABLE LAW

1. Title 21, United States Code, Section 841(a)(1) and (b)(1)(C) prohibits any person from knowingly or intentionally distributing a mixture or substance containing a detectable amount of N-phenyl-N- [ 1- ( 2-phenylethyl ) -4-piperidinyl ] propanamide, also known as fentanyl. Fentanyl is a Schedule II substance under the Controlled Substances Act.

2. The elements of a violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) are as follows: (i) the defendant knowingly distributed a mixture or substance containing a detectable amount of fentanyl; and (ii) the defendant knew that the substance he distributed was or contained fentanyl or some other federally controlled substance. "Distributing" means delivering or transferring possession of fentanyl to another person, with or without any financial interest in that transaction.

3. Title 18, United States Code, Section 2 provides that one who "aids" or "abets" the commission of an offense against the United States—including a violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C)—"is punishable as a principal."

## FACTS ESTABLISHING PROBABLE CAUSE

**A.      Overview of Investigation**

1.      The Drug Enforcement Administration ("DEA"), Oakland Resident Office, is investigating the drug trafficking activities of MEJIA and certain of his known and as-yet unknown co-conspirators, including Darwin AVILA-DIAZ. Based on the investigation conducted so far, agents have learned that AVILA-DIAZ and MEJIA are mid- or street-level poly-drug distributers who live outside San Francisco but regularly commute to the Tenderloin district, where they work together to distribute narcotics, including fentanyl, heroin, and cocaine.

**B.      Agents Conduct Controlled Purchases of Drugs from AVILA-DIAZ in the Tenderloin**

2.      In September 2022, as part of an ongoing investigation, agents identified AVILA-DIAZ as a suspected mid- or street-level narcotics dealer who uses a cellular telephone assigned call number (415) 879-0253 ("TT1") in furtherance of narcotics-trafficking activities that he conducts in the Tenderloin district of San Francisco, perhaps among other places.

3.      Between January and May 2023, law enforcement officers conducted multiple controlled purchase operations in which a UC purchased heroin, cocaine, and fentanyl from AVILA-DIAZ in the Tenderloin. I served as the UC in all of these transactions.

<u>January 13, 2023: First UC Purchase</u>

4.      In the first of the controlled purchase operations, I sent a recorded text message to TT1 at approximately 11:52 a.m. on January 13, 2023, in which I told AVILA-DIAZ—with whom I had no prior relationship and had never communicated—that I needed "some black" (which I know from my training and experience is a common street and slang term for heroin) and asked AVILA-DIAZ if he would be "by Eddy n Hyde St around 1."[1] One minute later, AVILA-DIAZ responded: "It's okay, Teve or by civi you can," which I understood to mean that he was agreeing to sell me heroin at or near the Civic Center BART Station, which is in the Tenderloin and which I know from my training and experience is a common location for drug

---

[1] My communications with AVILA-DIAZ were primarily in English. On one occasion I used Google Translate (English to Spanish), but that communication is not set forth in this affidavit.

transactions.

5. In subsequent conversations that same day, AVILA-DIAZ and I agreed to meet at or near the intersection of Turk and Polk Streets in San Francisco where I would purchase $100 worth of heroin.

6. At approximately 1:52 p.m., I arrived at the intersection of Turk and Polk Streets in San Francisco. Moments later, I observed AVILA-DIAZ (who I identified from a booking photo from one of his prior arrests) arrive wearing a black hat, black sweater, black Nike sweatpants, and white shoes. My conversations with AVILA-DIAZ during this and subsequent controlled purchases were captured by DEA recording equipment (audio and video) that I had on my person.

7. I asked AVILA-DIAZ if he had $100 worth of "black" (heroin), and he confirmed he did, pulling plastic baggies containing a black rock-like substance I recognized to be heroin from his front sweater pocket. I then asked AVILA-DIAZ if he had any "yellow" (which I know from my training and experience is a street and slang word for fentanyl). AVILA-DIAZ asked how much "yellow" I wanted, and I responded that I wanted "an ounce." But AVILA-DIAZ then told me he did not have any "yellow," and that he only had "chiba," which I know from my training and experience is a street and slang term for heroin.

8. I handed AVILA-DIAZ $100 for the heroin and observed him reach into his left front pants pocket, from which he removed a clear plastic bag containing several smaller clear plastic bags that themselves contained what appeared to be both heroin and cocaine.

9. I then negotiated with AVILA-DIAZ to purchase approximately $200 worth of cocaine and handed him $200 in exchange for multiple baggies containing a white powdery substance resembling cocaine. (This was in addition to the $100 I had previously given AVILA-DIAZ for the heroin.)

10. Before ending the transaction, I showed AVILA-DIAZ a cellphone that displayed (415) 879-0253—the number assigned to TT1—on the screen. I asked AVILA-DIAZ if that was his number and AVILA-DIAZ confirmed it was. I told AVILA-DIAZ I wanted "yellow" (fentanyl) next time and that I would call him the following week. AVILA-DIAZ told me he

7

would call for fentanyl next time, which I understood him to mean he would call his supplier to get fentanyl to sell to me. The drug transaction concluded at approximately 1:58 p.m., when I left the location.

11. Following the drug transaction, law enforcement officers tested the suspected heroin and cocaine using a TruNarc Analyzer. The suspected heroin tested positive for heroin, and the suspected cocaine tested positive for cocaine.

January 18, 2023: Second UC Purchase

12. On January 17, 2023, I sent a recorded text message to TT1 at approximately 2:31 p.m. to coordinate a drug transaction for the following day. Specifically, I asked AVILA-DIAZ for "1oz yellow"—that is, one ounce of fentanyl—and he confirmed by saying "Oz tumorrow."

13. The following day, at approximately 1:41 p.m., AVILA-DIAZ used TT1 to send me a text message with a Google pin location for 200 Larkin Street in San Francisco, which is in the Tenderloin district and which is the address for the Asian Art Museum. I understood AVILA-DIAZ to be telling me that was to be the location for our transaction, and immediately after he sent me the Google pin location, he and I negotiated a price of $360 for the ounce of fentanyl. AVILA-DIAZ also agreed to bring some "Chiba"—that is, heroin—when I told him I would bring "a lil extra" money for it.

14. At approximately 2:45 p.m., I walked to the vicinity of 200 Larkin Street in San Francisco, where I observed AVILA-DIAZ standing on the sidewalk wearing a black hat and black sweatshirt. We sat on the sidewalk and conducted the transaction. AVILA-DIAZ handed me a clear plastic bag containing a white, rock-like, powdery substance, which I suspected to be fentanyl, and I gave him $360 in cash. After I paid for the fentanyl, I asked AVILA-DIAZ for "$240 worth" of heroin, as we had discussed via text message earlier that day. He handed me several clear plastic bags containing a substance I believed to be heroin, and I gave him $240 in cash. The drug transaction concluded, and I left the location.

15. Following the drug transaction, law enforcement officers tested the suspected fentanyl using a Premier Bio-Dip test kit. The suspected fentanyl tested positive for the presence

of fentanyl.

### C. Agents Observe AVILA-DIAZ Conferring with Suspect 2 (MEJIA) During UC Buy

<u>February 2, 2023: Third UC Purchase</u>

16.	On February 1, 2023, I sent a recorded text message to TT1 at approximately 1:49 p.m. to coordinate a drug transaction for the following day. Specifically, I asked AVILA-DIAZ for two ounces of fentanyl, and he confirmed he would have it.

17.	The following day, at approximately 11:35 a.m., I made a recorded call to AVILA-DIAZ on TT1, in which I told him I would arrive for the drug transaction in about an hour.

18.	At approximately 12:40 p.m., I walked to the vicinity of 200 Larkin Street in San Francisco, where I approached AVILA-DIAZ, who was on the phone speaking in Spanish. I overheard AVILA-DIAZ say "amarillo," which is a Spanish word meaning "yellow." As discussed elsewhere in this affidavit, I know from my training and experience that "yellow" is a street and slang term for fentanyl. Thus, I believe AVILA-DIAZ was on the phone with a possible fentanyl supplier for the purposes of acquiring fentanyl to sell to me.

19.	AVILA-DIAZ and I greeted one another and walked northbound on Larkin Street toward my undercover vehicle. Upon arrival at my undercover vehicle, AVILA-DIAZ showed me an English translation/dictation on his cellphone which stated, in English, that his brother was bringing the "feno"—which I understood from my training and experience to refer to fentanyl—and he (AVILA-DIAZ) was waiting on him. Shortly thereafter, AVILA-DIAZ told me that he would return.

20.	Agents observed AVILA-DIAZ walk away, meet with another man whose identity was unknown at the time (SUSPECT 2, who was later identified by agents as MEJIA), and walk down Fulton Street.

21.	Law enforcement officers conducting surveillance followed AVILA-DIAZ and SUSPECT 2 on foot and, at approximately 12:48 p.m., observed them talking in front of the Civic Center BART Station entrance with an unknown Hispanic male ("UM"). After a short

time, law enforcement officers observed SUSPECT 2 walk to Market Street and leave the area. Shortly thereafter, surveillance units observed UM point toward 7th Street and Market Street and AVILA-DIAZ begin walking in that direction.

22. Between approximately 12:57 p.m. and approximately 1:10 p.m., AVILA-DIAZ (using TT1) and I had the following text message conversation:

| | | |
|---|---|---|
| AVILA-DIAZ: | | He's in a hurry, look, he's not coming (12:57 p.m.) |
| Me: | | I just need 2 can u call ur guy money is good (1:03 p.m.) |
| AVILA-DIAZ: | | It's just that today is a hot day, that's why the person Feno is walking around hasn't come. (1:10 p.m.) |

23. Based on my training and experience, I believe AVILA-DIAZ was informing me that his "brother," who allegedly had the fentanyl, was not coming. I informed AVILA-DIAZ that I had the money ready for the fentanyl sale ("money is good"). When AVILA-DIAZ said that "today is a hot day" which is "why the person Feno is walking around hasn't come," I believe, based on my training, experience, and conversations with other law enforcement officers, that AVILA-DIAZ was indicating to me that his fentanyl source was not accessible or present in the area due to an increased police presence ("hot day").

24. Nevertheless, at approximately 1:17 p.m., I sent AVILA-DIAZ a text message stating: "How long? I gotta make some moves soon," and AVILA-DIAZ immediately responded: "3 minutos." Five minutes later, at approximately 1:22 p.m., AVILA-DIAZ sent me a text message saying: "boy on the way."

25. At approximately 1:36 p.m., about 14 minutes after he told me "boy on the way," AVILA-DIAZ sent me a text message saying "come here." I then walked to the corner of 200 Larkin Street, where I observed AVILA-DIAZ talking with SUSPECT 2.

26. AVILA-DIAZ and I sat down near the sidewalk of the Asian Art Museum in the vicinity of 200 Larkin Street to conduct the narcotics transaction.

27. AVILA-DIAZ handed me three clear plastic bags containing a white, rock-like, powdery substance, which he had retrieved from his person and which I suspected to be fentanyl.

When I asked, "you got two, right?," AVILA-DIAZ said "yeah," confirming he provided me with two ounces of fentanyl. AVILA-DIAZ placed the fentanyl in my sweater pocket, and I asked for $100 of "chiba" (heroin). AVILA-DIAZ handed me several small clear plastic baggies containing a black, hard, rock-like substance, which he retrieved from a pants pocket and which I suspected to be heroin. I handed AVILA-DIAZ $800 in cash for the suspected fentanyl and heroin, concluded the transaction with AVILA-DIAZ, and walked away from the deal.

28. Following the deal, law enforcement officers submitted the suspected fentanyl for laboratory testing. The DEA laboratory confirmed that the suspected fentanyl tested positive for the presence of fentanyl and had a net weight of approximately 57.3 grams.

**D.  Agents Identify MEJIA as AVILA-DIAZ's Accomplice, SUSPECT 2**

29. After the third UC purchase on February 2, 2023, agents conducted a toll analysis on TT1 and determined that the user of a phone assigned call number (510) 767-1426 had communicated with AVILA-DIAZ (on TT1) several times that day before AVILA-DIAZ sold fentanyl and heroin to me.

30. In light of the facts described above, I believed SUSPECT 2 was the user of (510) 767-1426, and after running that phone number through law enforcement databases, I learned that a man named Kevin Estrada-MEJIA used it in connection with approximately 32 wire transfers to Honduras between February 2021 and May 2023. (A person who wishes to send money to a foreign country using wire remitter services ordinarily must provide a phone number to complete the transaction.)

31. I also (i) obtained subscriber information for the phone number (510) 767-1426, which is subscribed to "Wireless Caller" at "830 20th Street, Richmond, CA"; and (ii) conducted a criminal history check on, and obtained a photograph of, MEJIA, who I recognized as SUSPECT 2—the then-unknown man I and other agents had seen with AVILA-DIAZ several times on February 2, 2023.

E.     **MEJIA Aids and Abets AVILA-DIAZ's Sale of Fentanyl to UC**

February 16, 2023: Fourth UC Purchase

32.    On February 16, 2023, I sent a recorded text message to TT1 at approximately 11:08 a.m., in which I coordinated a purchase of two ounces of fentanyl from AVILA-DIAZ for later that day. About an hour later, AVILA-DIAZ confirmed the deal for "[t]wo yellow" and said he would "be waiting for [me]." We subsequently agreed to meet later that afternoon at the same location as two of our prior transactions: 200 Larkin Street in San Francisco.

33.    At approximately 3:02 p.m., I sent a text message to TT1 to tell AVILA-DIAZ I had arrived to conduct the narcotics transaction. AVILA-DIAZ (using TT1) responded at 3:04 p.m. to say: "Same place wait for me there." AVILA-DIAZ arrived at approximately 3:30 p.m. and handed me several clear plastic bags containing a white, rock-like, powdery substance, which I suspected to be fentanyl and which AVILA-DIAZ placed in my jacket pocket. In exchange, I gave AVILA-DIAZ $700 in cash.

34.    After I paid for the two ounces of suspected fentanyl, I asked AVILA-DIAZ for two more ounces of fentanyl and $200 worth of "chiba" (heroin). AVILA-DIAZ walked away and I saw him make a phone call. He concluded the phone call, walked back over to me and said, "he coming, 10 minutes." Toll analysis on TT1 subsequently confirmed that AVILA-DIAZ called MEJIA (at 510-767-1426) right around this time.[2]

35.    Not long thereafter, MEJIA arrived and walked up to AVILA-DIAZ, handing him multiple clear plastic bags containing a white substance. I observed AVILA-DIAZ place the bags in his front sweater pocket. Immediately thereafter, AVILA-DIAZ approached me and sat down next to me. I asked him "that's your boy?" and AVILA-DIAZ replied "yeah." AVILA-DIAZ handed me a plastic baggie containing a brown, powdery substance that I suspected to be heroin. He then pulled several clear plastic baggies from his front sweater pocket (the same pocket in which I had just observed AVILA-DIAZ place the bags he had received from MEJIA), each of

---

[2] On that same date, February 16, 2023, agents surveilling MEJIA called the phone number MEJIA was believed to use (510-767-1426) and physically observed MEJIA answer the phone, confirming he does, in fact, use that phone number.

which contained a white powdery substance I suspected to be fentanyl, and handed them to me. I took the suspected heroin and fentanyl and paid AVILA-DIAZ $860 (on top of the $700 I had given him a few minutes prior for the original two ounces of suspected fentanyl). The drug transaction concluded a few minutes later.

36. After the deal concluded, law enforcement officers submitted the suspected fentanyl for testing at the DEA laboratory. The DEA laboratory confirmed that the suspected fentanyl tested positive for the presence of fentanyl and had a net weight of approximately 109.8 grams (gross). The suspected heroin weighed 34.6 grams.

**F.   MEJIA and AVILA-DIAZ Communicate with One Another About Narcotics**

37. On May 11, 2023, the Hon. Edward J. Davila issued an order authorizing the interception of wire and electronic communications to and from TT1. *See* Case No. 23-CR-90895 MISC EJD.

38. On May 12, 2023, the DEA began intercepting wire and electronic communications to and from TT1. Interceptions on TT1 continued every day through June 1, 2023, when AVILA-DIAZ was arrested, except for two days in May during which TT1 was temporarily out of service. MEJIA and AVILA-DIAZ communicated with one another on at least six days in that timeframe: every day from May 12-15 and on May 17 and May 19.

39. For example, on May 14, 2023, at approximately 1:21 p.m., a call from MEJIA (using 510-767-1426) to AVILA-DIAZ (on TT1) was intercepted and recorded (TT1, Call No. 16123). The conversation between MEJIA and AVILA-DIAZ occurred in Spanish. A summary of the call, which was translated to English by a DEA-employed linguist, is as follows[3]:

> *Parties greeted. MEJIA said the dude (third party) had the money and asked if AVILA-DIAZ had another ½. AVILA-DIAZ said he (AVILA-DIAZ) only had ¼. MEJIA asked AVILA-DIAZ to hold on and said he (MEJIA) was going to tell him (third party). [Aside: MEJIA said he (AVILA-DIAZ) only had ¼.] MEJIA said he (third party) said that was fine. AVILA-DIAZ said okay and said he (AVILA-DIAZ) would bring it (¼) to MEJIA. MEJIA asked if AVILA-DIAZ was on 9th (Street),*

---

[3] This is a non-verbatim account based upon an initial summary that was prepared by DEA linguists. As such, it is possible that there will be discrepancies between the description set forth above and any final transcripts that are prepared.

*AVILA-DIAZ said yes, on 9th (Street). MEJIA told AVILA-DIAZ to come down and said they (MEJIA and third party) were going up. AVILA-DIAZ said okay, he (AVILA-DIAZ) would go shortly. MEJIA said okay and restated they (MEJIA and third party) were going up.*

40. The foregoing summary is only a preliminary (and partial) summary/synopsis of the conversation between MEJIA (using 510-767-1426) and AVILA-DIAZ (using TT1).

41. I believe that the intercepted call summarized above involved a discussion of a sale of narcotics by MEJIA to an unknown third party. I further believe that MEJIA asked AVILA-DIAZ if he had a particular quantity of narcotics (possibly either ½ ounce or ½ pound), that AVILA-DIAZ said he only had ¼ (possibly either ¼ ounce or ¼ pound), that the third party told MEJIA the lower quantity of narcotics (¼) was fine, and that AVILA-DIAZ told MEJIA he (AVILA-DIAZ) would bring the ¼ to MEJIA. I know from training and experience and my knowledge of other drug trafficking investigations in the Bay Area that narcotics traffickers will deal in quantities such as ½ ounce or ¼ pound, and that they refer to those quantities in shorthand as simply ½ or ¼.

42. In light of the foregoing, and based on my training and experience, I believe MEJIA and AVILA-DIAZ are working together to sell narcotics, including fentanyl, heroin, and cocaine, in the Tenderloin district of San Francisco, California, and that they are communicating with one another (and others) about drug sales, among other things.

## SEALING REQUEST

43. Based on my training and experience, the disclosure of the existence of this Affidavit, the Complaint, arrest warrant, and/or all related documents may cause MEJIA's co-conspirators, known and as-yet unknown, to destroy evidence or to conceal ongoing criminal activity, jeopardizing the progress of this ongoing investigation. The disclosure of these documents may also cause co-conspirators to flee from prosecution. I therefore request that the Court seal this Affidavit, the Complaint, the summons and arrest warrant, and all related documents.

## CONCLUSION

44.     Based on the facts set forth in this affidavit, I believe there is probable cause to believe MEJIA distributed—and/or aided and abetted the distribution of—a mixture or substance containing a detectable amount of N-phenyl-N- [ 1- ( 2-phenylethyl ) -4-piperidinyl ] propanamide, also known as fentanyl, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2.

/s/ *Connor R. Hooper*
CONNOR R. HOOPER
Special Agent
Drug Enforcement Administration

Sworn to before me over the telephone and signed by me pursuant to Fed. R. Crim. P. 4.1 and 4(d) on this 8th day of June 2023.

HON. SALLIE KIM
UNITED STATES MAGISTRATE JUDGE